**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Communications Workers of America Plan for Employees' Pensions and Death Benefits,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>CSK Auto Corporation, et al.,<br><br>　　　　　Defendants. | No. CV06-1503-PHX-DGC (Lead)<br>No. CV06-1580-PHX-JWS<br><br>(Consolidated)<br><br>**ORDER** |

Defendants CSK Auto Corporation ("CSK") and Maynard L. Jenkins have filed a motion to dismiss the Second Amended Consolidated Complaint ("Second Amended Complaint"). Dkt. #86. Defendant Don Watson has joined the motion. Dkt. ##89, 106. Defendant Martin G. Fraser has filed a separate motion to dismiss. Dkt. #90. Oral argument was held on September 13, 2007. For the reasons stated below, the Court will grant Defendant Fraser's motion and deny the motions of Defendants Jenkins and Watson.

**I.　Background.**

CSK is a retailer of automotive parts and accessories under the names Checker Auto Parts, Schuck's Auto Supply, and Kragen Auto Parts. Dkt. #82 ¶ 34. Beginning on March 27, 2006, CSK made a series of public announcements that it would restate prior years' financial statements due to accounting errors uncovered by its Audit Committee. *Id.* ¶ 108. After the March announcement, CSK's stock price fell $1.26 to $14.64 per share. *Id.* ¶ 109. The price fell to $13.06 per share after a similar announcement on April 14, 2006. *Id.* ¶ 111. On September 28, 2006, CSK confirmed that accounting errors and irregularities

had impacted its financial statements during fiscal years 2001 to 2003, each quarter in 2004, and the first three quarters of 2005. *Id*. ¶ 113. The overstatements included $70 million in inventory, $12 million in vendor allowances, and $3-7 million in store surplus fixtures and supplies. *Id*. The company also announced that Chief Operating Officer Martin Fraser and Chief Financial Officer ("CFO") Don Watson would no longer be employed, and that Chairman and Chief Executive Officer ("CEO") Maynard Jenkins would retire. *Id*.

CSK's restatements revealed that the company's financial performance was approximately $17 million worse from 2001 through the first three quarters of 2005 than previously reported. *Id*. ¶ 26. For the years 2001, 2002, and 2003 – years in which the company previously had reported annual net losses – the company in fact had greater net loss than reported: $25 million more for 2001, $16 million more for 2002, and $12 million more for 2003. *Id*. For 2004 and the first three quarters of 2005 – periods in which the company previously had reported net income – the restatements revealed better results. Net income in 2004 was actually $23 million more than previously reported and net income in the first three quarters of 2005 was $14 million more than reported. *Id*.

Plaintiff Communications Workers of America Plan for Employees' Pensions and Death Benefits seeks to represent a class of individuals who acquired CSK securities during a Class Period from March 20, 2003 to April 13, 2006. *Id*. ¶¶ 1, 32. Plaintiff alleges that Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5, and that Fraser, Watson, and Jenkins violated Section 20(a) of the Exchange Act. *Id*. ¶¶ 197-224.

On March 28, 2007, the Court granted Defendants' motions to dismiss Plaintiff's First Consolidated Class Action Complaint ("First Complaint") for failure to comply with Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Dkt. #67. The Court granted Plaintiff leave to file an amended complaint, which Plaintiff did on April 26, 2007. Dkt. #69. The Court then permitted Plaintiff to file a second amended complaint to incorporate information from CSK's most recent SEC Form 10-K. Dkt. #81. Plaintiff filed the Second Amended Complaint on May 25, 2007. Dkt. #82.

**II.     Pleading Requirements in Securities Fraud Actions.**[1]

To establish a claim under Section 10(b) and Rule 10b-5, a plaintiff must plead and prove (1) a material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005). To plead scienter properly, "[t]he complaint must allege that the defendant made false or misleading statements either intentionally or with deliberate recklessness or, if the challenged representation is a forward looking statement, with actual knowledge that the statement was false or misleading." *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1085 (9th Cir. 2002) (quotations omitted).

Defendants bring their motions under Rules 9(b) and 12(b)(6) and the PSLRA. Under the PSLRA, a complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). The complaint must also, "with respect to each act or omission[,] . . . state with particularity facts giving rise to a *strong inference* that defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added).

Since this Court's dismissal of Plaintiff's complaint, the Supreme Court has addressed the "strong inference" requirement. *See Tellabs, Inc. v. Makor Issues & Rights. Ltd.*, 127 S.Ct. 2499 (2007). The Supreme Court explained the background of the PSLRA, noting that civil securities fraud actions "can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law." *Id.* at 2504. As a check against such abuse, Congress imposed "exacting pleading requirements," obligating plaintiffs "to state with particularity both the facts constituting the alleged violation, and the facts

---

[1] Defendants ask the Court to dismiss the Second Amended Complaint because it adopts a "puzzle-style" of pleading that fails to identify specific false statements. Although the Court agrees that the complaint is too long, too repetitive, and somewhat imprecise, it is sufficiently clear to enable Defendants to respond and this Court to rule.

- 3 -

1 evidencing scienter, *i.e.*, the defendant's intention 'to deceive, manipulate, or defraud.'" *Id.*
2 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 and n. 12 (1976)).

3       The Supreme Court established four principles for deciding Rule 12(b)(6) motions
4 under the PSLRA. First, all factual allegations in the Plaintiff's complaint must be taken as
5 true. Second, the Court must consider the complaint in its entirety. All of the facts alleged,
6 taken collectively, must be considered in deciding whether the complaint gives rise to a
7 strong inference of scienter. Third, in deciding whether the pleaded facts give rise to a strong
8 inference, the Court must take into account plausible opposing inferences. Fourth, the
9 inference of scienter must be cogent and at least as likely as any plausible opposing
10 inference. *Tellabs*, 127 S.Ct. at 2509-10, 2513.

11       The level of certainty required for a "strong inference" was debated between the
12 majority and concurring opinions in *Tellabs*. Justice Ginsberg, writing for the majority,
13 concluded that an inference of scienter need only be as plausible as opposing inferences of
14 nonculpable intent. Justice Scalia, writing in concurrence, would have required that the
15 inference of scienter be more plausible than the inference of innocence. *Id*. at 2513. Justice
16 Scalia's view was explicitly rejected by the majority, and this Court must therefore follow
17 the equal inference approach.

18       This point is particularly important in resolving the present motion. As explained in
19 the Court's previous order (Dkt. #67), facts alleged in Plaintiff's First Complaint gave rise
20 to some inference of scienter. The Court concluded that the inference was not strong,
21 however, because the Court readily could see non-fraudulent explanations for the various
22 facts alleged in the First Complaint. Incompetence or negligence on the part of Defendants
23 could explain many of the allegations, and such an explanation was as plausible as an
24 inference of bad intent. The Supreme Court has now made clear, however, that a tie goes to
25 the Plaintiff. If the Plaintiff presents facts from which an inference of scienter may be drawn,
26 and that inference is as likely as any nonculpable explanation, the complaint will survive a
27 Rule 12(b)(6) challenge under the PSLRA. This approach leads the Court to conclude that
28 the allegations of the Second Amended Complaint must survive the motions to dismiss filed

1  by Defendants Jenkins and Watson.[2]

2  **III. Analysis.**

3      **A. Misrepresentation by Defendant Fraser.**

4      Defendant Fraser moves to dismiss the Second Amended Complaint on the ground
5  that he did not make a materially false or misleading statement during the Class Period.
6  Dkt. #90. Fraser was the company's Chief Operating Officer, and Plaintiff does not allege
7  that he had any responsibility for or specialized knowledge of accounting.

8      The Court previously held that the two statements attributed to Defendant Fraser were
9  insufficient to show misrepresentation because the First Complaint did not specify why those
10 statements were false or misleading. Dkt. #67 at 4-5 (citing *In re GlenFed Sec. Litig.*, 2 F.3d
11 1541, 1547-48 (9th Cir. 1994) (en banc) (*superseded on other grounds* by the PSLRA)).

12     The Second Amended Complaint attributes two statements to Defendant Fraser. The
13 first comes from a June 4, 2004 conference call:

> Our in-stock position is just marginally better than it was last year. ***But our in-stock position is very good in our stores. We have an excellent perpetual inventory system that does automatic replenishment at the stores and warehouses and our in-stock position is extremely high.*** It is high 90s.

---

[2]This Court finds the *Tellabs* equal-inference approach problematic. When deciding whether an inference of scienter is "strong," the Court necessarily compares it to any inference of nonculpable intent that can be drawn from the same facts. The *Tellabs* majority acknowledges this necessity, stating that "[t]he inquiry is necessarily comparative." *Id.* at 2510. Or as the majority states elsewhere, the inference must be "strong in light of other explanations." *Id.* But if comparison is the touchstone for assessing the strength of an inference, how can an inference of scienter be deemed "strong" when it is only equally plausible to an alternative innocent explanation? It is not strong when compared to the innocent explanation – it is the same. The majority nonetheless requires courts faced with equally plausible explanations to conclude that the scienter inference is strong by comparison. As the majority makes clear, a plaintiff need only "plead facts rendering an inference of scienter at *least as likely as* any plausible opposing inference." *Id.* at 2513 (emphasis in original). Some might suggest that the Court must determine whether the inference of scienter is strong before comparing it to plausible inferences of nonculpable intent, but the Court does not know how to do that. As the majority itself explained, "[t]he strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative." *Id.* at 2510.

1   Dkt. #82 ¶ 76 (emphasis in original). This quote simply adds a sentence to either end of the
2   sentence the Court has already found insufficient. Plaintiff still has not explained how this
3   statement is false. *See* Dkt. #67 at 4-5.
4       The second statement comes from a December 5, 2005 conference call:

> What we saw and we said was that the discretionary accessory type items, that would be things like tools, jacks, ramps, seat covers, we did see a drop-off compared to [the] trend of where those were running. The core parts business propped up partially by the continuing good performance of the commercial sales continued to do quite well. As we said in previous calls, our inventory system is very dynamic and it adjusts automatically when these things happen, so I don't really see any big inventory issues that came out of that.

9   Dkt. #82 ¶ 103. Plaintiff does not explain how this statement is false, or even how it relates
10  to the inventory accounting problems over which Plaintiff is suing. This statement refers to
11  the management inventory process, not to the inventory accounting that forms the basis of
12  Plaintiff's suit. *See* Dkt. #67 at 5. Plaintiff has not shown how this statement constitutes a
13  misrepresentation. There is no discussion of why CSK's inventory system was not
14  "dynamic" or could not "adjust[] automatically," no allegation that commercial sales did not
15  do "quite well," and no explanation of why Defendant Fraser was wrong to say there were
16  no "big inventory issues." Dkt. #82 ¶ 103. Plaintiff has failed to show "why this statement
17  would have been misleading at the [time] at which it was alleged to have been made." *In re*
18  *Vantive*, 283 F.3d at 1086 (rejecting as an alleged misrepresentation defendant's statement
19  that the sales teams were "extremely strong" and had a "key competitive advantage").

20      In addition, the statement that the inventory system is "dynamic" is too vague to
21  constitute an actionable misrepresentation. *See, e.g., Wenger v. Lumisys, Inc.*, 2 F.Supp.2d
22  1232, 1245 (N.D.Cal. 1998) ("Vague statements of opinion are not actionable under the
23  federal securities laws because they are considered immaterial and discounted by the market
24  as mere 'puffing'"). "No matter how untrue a statement may be, it is not actionable if it is
25  not the type of statement that would significantly alter the total mix of information available
26  to investors." *Id.* (quotations omitted).

27      Furthermore, as discussed in detail in the Court's previous dismissal order, Defendant
28  Fraser's mere participation in conference calls during the Class Period is not sufficient to

subject him to liability. Dkt. #67 at 5-6. His presence during the calls does not amount to "substantial participation or intricate involvement in the preparation of fraudulent statements." *See Howard v. Everex Sys. Inc.*, 228 F.3d 1057, 1061 n.5 (9th Cir. 2000). The Court will grant Defendant Fraser's motion to dismiss.

### B. Scienter – Defendant Jenkins, Watson, and CSK.

The Court previously found that Plaintiff's First Complaint gave rise to an inference of scienter. Dkt. #67 at 14. This conclusion was based on the high level positions held by Defendants Jenkins and Watson, their central role in the finances of CSK, the corporation's admission that serious accounting errors occurred on their watch, their explicit certifications that the financial results were compiled in accordance with generally accepted accounting principles and were accurate, and the substantial levels of stock sales undertaken by Jenkins and Watson at a time when the inaccurate financial reports of CSK painted a more favorable picture than in fact existed. Dkt., #67 at 11, 14.

The Second Amended Complaint adds detail and facts that the Court considers significant. These new allegations, when combined with the allegations of the First Complaint, cause the Court to conclude that Plaintiff has alleged facts giving rise to a cogent inference of scienter that is as plausible as an inference of nonculpability. The facts recited below are taken from the Second Amended Complaint and, for purposes of this motion, are assumed to be true. *Tellabs*, 127 S.Ct. at 2509. The facts are discussed in a somewhat general nature, consistent with the Supreme Court's directive that the Court must consider the complaint in its entirety, "not whether any individual allegation, scrutinized in isolation, meets the standard." *Id*.

CSK's Form 10-K for the fiscal year 2005 (the "10-K") was issued after accounting problems had been found and investigated by the Audit Committee of CSK's Board of Directors. It is quoted frequently in the Second Amended Complaint. The 10-K identifies "errors and irregularities," along with internal control deficiencies, that resulted in CSK's inaccurate financial statements. Dkt. #82, ¶24. The 10-K's use of the term "irregularities" is significant because it "refers to intentional misstatements or omissions of amounts on

1  disclosure in financial statements." *Id.* ¶ 24 n.2 (quoting Statement on Auditing Standards
2  No. 53). The 10-K states that these "irregularities" – intentional misstatements – were
3  "directed by certain personnel." The "certain personnel" are not identified, but the 10-K also
4  states that "senior management" at CSK "suppressed accounting related inquiries" within the
5  company, "discouraged employees from raising accounting related concerns," and failed,
6  through communications and behavior, to emphasize adherence to CSK's "code of business
7  conduct and ethics." *Id.* ¶ 140. Defense counsel acknowledged during the hearing on this
8  motion that "senior management" includes CEO Jenkins and CFO Watson.

In a March 27, 2006 press release, CSK stated that the "errors and irregularities relate primarily to the Company's inventories and vendor allowances." *Id.* ¶19. The problems in these two areas were later described in some detail by the 10-K. Inventory accounting problems included "inappropriate and inaccurate accumulations of inventory balances in in-transit accounts . . . which [were] known or should have been known to several members of the financial organization," allowing "errors in inventory balances to be inappropriately systematically amortized to cost of sales in improper periods," improper adjustments to product costs and improper journal entries that resulted in the overstatement of inventory, and "inappropriate capitalization of inventory overheads[.]" *Id.* ¶ 134. Problems in vendor allowances included inaccurate recording of "various vendor allowance transactions, including applicable cash collections and estimates," and the fact that "improper debits were issued and applied to accounts payable for amounts the Company was not entitled to receive." *Id.* ¶ 148. "These amounts were subsequently repaid to those vendors through direct cash payments, the foregoing of future cash discounts, the acceptance of increased prices on future purchases and paybacks through the warranty account." *Id.* These practices "resulted in errors in vendor allowance receivables, inventory, accounts payable and costs of sales accounts." *Id.* ¶ 148.

The Second Amended Complaint provides further detail concerning errors and irregularities that occurred under the supervision of Defendants Jenkins and Watson. These include the clearing of receiving docks so that delivered inventory would remain off CSK's

- 8 -

1  books (¶ 150), the classification of in-transit inventory as store inventory to balance reports
2  (¶ 152), the failure of CSK to notify vendors of credits to their accounts, while immediately
3  sending debit memos to vendors who had under-shipped inventory (¶ 153), the recording of
4  defective or destroyed inventory as an asset rather than as an expense, and the fact that these
5  records were approved weekly by Defendant Watson (¶ 156), CSK's falsely inflating of
6  accounts receivable to make up for low vendor allowances and then treating the receivables
7  as store theft to get them off the balance sheet (¶¶ 39(b)(i), 143), the inflation of vendor
8  allowances by $3.1 million during the Class Period (¶¶ 39(g), 144), the basing of vendor
9  allowance amounts on monthly budget forecasts rather than on the actual amount of vendor
10 allowances (¶ 145), management's instruction that CSK employees should respond to
11 questions from outside auditors with "yes," "no," or "I don't know" answers (¶ 146), and
12 improper accounting for worker compensation liabilities (¶ 168).

13    The statements in the 10-K and the allegations of errors and irregularities in the
14 Second Amended Complaint are consistent with alleged statements from confidential
15 witnesses.  CW8, an internal auditor at CSK until early 2006, asserts that CSK operated
16 without any internal audit department until late 2005, that CW8 found in early 2006 that
17 certain inventory accounts were not properly reconciled and that the most suspicious of those
18 accounts were vendor rebates and in-transit inventory, that Defendant Watson became upset
19 when these findings were presented to him – crumpling up the paper, throwing it against the
20 wall, and adjourning the meeting – and that auditors at CSK feared considerable push-back
21 from Defendant Watson.  *Id.* ¶ 39(h).

22    CW7 worked as a staff accountant in the accounts payable department until early
23 2007.  CW7 stated that CSK would record defective or destroyed inventory as a balance
24 sheet asset, rather than taking it as an expense, and that Defendant Watson knew of this fact
25 because he signed weekly account reports. CW7 further reported that CSK falsified vendor
26 allowance accounts, creating false invoices and charging them against vendors to inflate
27 certain warranty accounts by approximately $3.1 million. CW7 stated that Defendant Watson
28 had direct knowledge of this practice.

CW6 described a meeting in November 2005 when outside auditors were at CSK performing various Sarbanes-Oxley procedures. CSK management called a meeting with the vendor receivables department and instructed the staff to respond only with "yes," "no," or "I don't know" to any inquiries from the auditors. CW6, who was an accounting clerk in the vendor receivables department until late 2005, further asserted that CSK's executives based the monthly vendor allowance income on budget forecasts, rather than actual inventory numbers. Management would take the previous years' numbers and mark them up 5-7% to come up with budget forecasts. These budgeted numbers would be reported as actual inventory numbers and would overstate CSK's vendor allowances.

CW5, who worked as an accounts payable clerk until the summer of 2005, reported that CSK's vendors were not notified of existing credits in their accounts. CSK created credit memos regarding the existing credits, but never informed the vendors of the credits. When vendors under-shipped an order, however, employees were instructed to send the vendor a debit memo the next day. CW5 estimated that the credit memo practice overstated inventory each week by $7,500 to $12,000.

Most of these witnesses do not allege direct knowledge by Defendants Jenkins and Watson, and those who do provide little or no supporting detail. In fact, the Second Amended Complaint generally fails to allege particular facts that show knowledge on the part of these defendants. Although Defendants Jenkins and Watson were the managers in charge of the CSK financial operations that produced these errors and irregularities, it seems possible that they simply were bad managers – that they were negligent or incompetent, neither of which would subject them to securities fraud liability. For several reasons, however, the Court concludes that an inference of scienter against Defendants Jenkins and Watson is as plausible as an inference of nonculpability.

First, more than financial bungling occurred at CSK. The 10-K and press releases make clear that "irregularities" – intentional misstatements – occurred.

Second, the 10-K specifically states that many of the financial irregularities were attributable to "senior management," which clearly included Defendants Jenkins and Watson.

- 10 -

The environment appears to have been one of more than negligence. Senior management "suppressed accounting related inquiries" within the company, "discouraged employees from raising accounting related concerns," and failed, through communications and behavior, to emphasize adherence to CSK's "code of business conduct and ethics." *Id.* ¶ 140.

Third, the extensive and systematic nature of the accounting irregularities would not likely have escaped the attention of the CEO and CFO. This is more than a case of isolated incidents or transactions.

Fourth, in 2002, 2003, 2004, and 2005, Defendants Jenkins and Watson repeatedly certified that they personally supervised and participated in the evaluation of CSK's financial controls and procedures and that the company's financial disclosures fairly and accurately presented its financial condition. *Id.* ¶¶ 51-53, 59, 63, 67, 71-72, 77, 81, 87, 96, 100, 104.

Fifth, CSK's many misleading 10-Q and 10-K reports were always followed by press conferences at which Defendants Jenkins and Watson described the favorable, but inaccurate, financial results, and did so after having certified that they personally reviewed the accuracy of CSK's internal accounting procedures.

Sixth, when CSK first announced that its Audit Committee had discovered the errors and irregularities, it also announced that Defendant Watson had left the company and Defendant Jenkins would retire.

Seventh, although somewhat lacking in detail, the confidential witnesses confirm the widespread nature of accounting irregularities within the company. Some of the witnesses attribute knowledge directly to Defendant Watson, and one describes a meeting in which Watson became incensed when suspicious accounts were identified.

Eighth, following favorable but inaccurate financial reports in June of 2003, Defendant Watson sold a portion of his stock in CSK. Following favorable but inaccurate financial reports in September of 2003, Defendant Jenkins sold a substantial portion of his stock holdings. These sales netted more than $7 million for Defendant Jenkins and $700,000 for Defendant Watson. Although it is true, as the Court noted in its previous order, that these sales occurred near-in-time to the expiration of stock options, it is also true that they occurred

1 in a financially favorable environment created by CSK's misleading reports. The sales do
2 not make scienter more likely than an innocent explanation for Defendants' conduct, but they
3 do add somewhat to the plausibility of a scienter inference when all of the facts set forth
4 above are taken into account.

5       To be sure, there are many facts that would support an inference of nonculpability.
6 Foremost among these is the fact that CSK's accounting irregularities actually understated
7 the company's net income in 2004 and the first three quarter of 2005 – hardly support for an
8 inference that Defendants Jenkins and Watson were wrongly trying to inflate the company's
9 worth and enrich themselves through accounting misdeeds. But the Court must consider the
10 Second Amended Complaint as a whole, and in doing so the Court cannot conclude that the
11 inference of nonculpability is greater than the inference of scienter. The widespread
12 problems at CSK may have resulted from poor management, but it appears equally plausible
13 that Defendants Jenkins and Watson possessed the deliberate recklessness or fraudulent
14 intent necessary for scienter in this circuit. *See In re Vantive Corp. Sec. Litig.*, 283 F.3d at
15 1085. Because Plaintiff need only "plead facts rendering an inference of scienter *at least as*
16 *likely as* any plausible opposing inference," Defendants' motion to dismiss must be denied.
17 *Tellabs*, 127 S.Ct. at 2513 (emphasis in original).

18       **D.**    **Leave to Amend with Respect to Defendant Fraser.**

19       The Court need not grant leave to amend if an amendment would be futile. *See In re*
20 *Vantive*, 283 F.3d at 1097. The Court's discretion to deny leave to amend is "particularly
21 broad where plaintiff has previously amended the complaint." *Allen v. City of Beverly Hills*,
22 911 F.2d 367, 373 (9th Cir. 1990). Here, Plaintiff has had four opportunities to plead its best
23 case against Defendant Fraser. *See* Dkt. ##1, 32, 69, 82. In granting Defendants' first
24 motion to dismiss, the Court clearly identified the deficiencies in Plaintiff's Complaint. After
25 three amendments, the Court finds it is "not unreasonable for the court to conclude that it
26 would be pointless to give the plaintiffs yet another chance to amend." *In re Vantive*, 283
27 F.3d at 1097. This is particularly true given the fact that Plaintiff has known the nature and
28 extent of Defendant Fraser's statements from the beginning of this case. If Plaintiff has not

been able to plead actionable misrepresentations by now, the Court is satisfied that Plaintiff never will be able to do so. The Court will dismiss the Second Amended Complaint against Defendant Fraser without leave to amend.

**IT IS ORDERED:**

1. Defendant Fraser's Motion to Dismiss (Dkt. #90) is **granted** without leave to amend.
2. Defendants CSK, Jenkins, and Watson's Motion to Dismiss (Dkt. #86) is **denied**.
3. By separate order, the Court will schedule a Rule 16 conference for the remaining parties.

DATED this 27th day of September, 2007.

_____
David G. Campbell
United States District Judge